**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                      **NO: 15-197**

**BLACK ELK ENERGY**
**OFFSHORE OPERATIONS, LLC ET AL**              **SECTION: "H"(4)**

## <u>ORDER AND REASONS</u>

Before the Court are Defendants Black Elk Energy Offshore Operations LLC and Grand Isle Shipyard's Motion to Dismiss Counts 1 through 11 (Docs. 133, 142); Defendant Don Moss's Motion to Dismiss Counts 9, 10, 11 (Doc. 129); Defendants Grand Isle Shipyard and Curtis Dantin's Motion to Dismiss Counts 4 through 11 (Docs. 138, 146); Defendant Wood Group PSN, Inc.'s Motion to Dismiss Counts 4 through 9 (Doc. 114); and Defendant Wood Group PSN, Inc.'s Motion to Dismiss Count 12 (Doc. 121). For the following reasons, Defendants Black Elk Energy Offshore Operations LLC and Grand Isle Shipyard's Motion to Dismiss Counts 1 through 11 is DENIED (Docs. 133, 142); Defendant Don Moss's Motion to Dismiss Counts 9, 10, 11 is GRANTED (Doc. 129); Defendants Grand Isle Shipyard and Curtis Dantin's Motion to Dismiss

1

Counts 4 through 11 is GRANTED (Docs. 138, 146); Defendant Wood Group PSN, Inc.'s Motion to Dismiss Counts 4 through 9 is GRANTED (Doc. 114); Defendant Black Elk's Motion to Dismiss Counts 4 through 8, as partially adopted from the Wood Group's Doc. 114, is DENIED (Doc. 136); and Defendant Wood Group PSN, Inc.'s Motion to Dismiss Count 12 is DENIED (Doc. 121).   The charges in Counts 4 through 11 of the Second Superseding Indictment against Don Moss, Curtis Dantin, the Wood Group PSN, Inc., and Grand Isle Shipyards are DISMISSED.

## BACKGROUND

The charges in the Second Superseding Indictment ("Indictment") arise out of the welding accident and explosion that occurred on an offshore oil platform called West Delta Block 32 Platform E (the "Platform") on November 16, 2012. According to the Indictment, Black Elk Energy Offshore Operations, LLC ("BEE") owned and operated the Platform, located eight nautical miles off the coast of Louisiana. At some point prior to November 2012, BEE ceased oil production on the Platform in order to initiate repairs and other construction projects. One project involved adding a divert valve to the Lease Automatic Custody Transfer ("LACT") unit.

BEE contracted with an engineering firm, represented on the Platform by Defendant Don Moss, to design plans for some of the construction projects. The construction was to be physically completed by crews from Defendant Grand Isle Shipyards, Inc. ("GIS"), supervised on the Platform by Defendant Curtis Dantin. BEE also contracted with Defendant Wood Group PSN, Inc. ("Wood Group") to supply manpower for the Platform. The Wood Group's operators, including the Person-In-Charge ("PIC") Defendant Christopher

Srubar, were to support the construction efforts through crane operations and the issuance of necessary permits.

The construction projects required hot work, including welding, grinding, and other activities that may produce a spark. The Outer Continental Shelfs Land Act ("OCSLA") provides certain regulations for performing hot work on an oil platform. Specifically, the regulations state that welding cannot be undertaken outside of a designated area until (1) "[t]he welding supervisor or designated person in charge advises in writing that it is safe to weld;" and (2) the lessee or operator and "the designated person in charge inspect the work area and areas below it for potential fire and explosion hazards."[8]

On the days leading up to the explosion, Srubar performed the required inspections and issued hot work permits for construction work on the Platform. Beginning on November 10, however, Srubar delegated this duty to another Wood Group operator. On Srubar's instruction, this inexperienced operator issued hot work permits on November 10 through 16 by copying the one that Srubar had created on November 9. Neither Srubar nor the operator conducted a pre-work inspection or designated a fire watch on these days.

During construction, it was discovered that the prefabricated piping needed to complete the upgrade of the LACT unit was missing. In order to save time, a BEE manager decided that the piping should be rebuilt instead. This required the construction crews to weld near the LACT unit. No inspection was performed in the LACT area prior to the welding that occurred on November 16, the day of the explosion. On that date, the Wood Group

---

[8] 30 C.F.R. § 250.113.

operator copied the previous day's hot work permit, which did not mention the LACT area. In addition, neither the piping nor the tanks in the LACT area were rendered inert prior to the start of construction in the area.

On November 16, Dantin was watching as the crew began to cut the sump line piping leading to the Wet Oil Tank in the LACT area. After the sump line piping was cut, liquid spilled from the piping. Dantin and the crew decided that the liquid was water and continued cutting and welding in the area. Dantin left the area thereafter and returned to his office. At approximately 9:00 a.m., as the workers attempted to weld the cut piping, hydrocarbon vapers escaped from the Wet Oil Tank and were ignited. The ignition set off a series of explosions, killing three workers and injuring others.

The Government alleges that the Defendants are at fault for the explosion and the resulting deaths and pollution. Counts 1 through 3 of the Indictment charge BEE and GIS with involuntary manslaughter. Counts 4 through 8 charge Wood Group, Srubar, BEE, Dantin, and GIS with failing to conduct pre-work inspections on each day from November 11 through 15. Count 9 charges Wood Group, Srubar, Moss, BEE, Dantin, and GIS with failing to conduct a pre-work inspection on November 16. Count 10 charges Moss, BEE, Dantin, and GIS with failing to ensure that the piping and tanks in the LACT area had been rendered inert and were safe to weld near before hot work commenced. Count 11 charges Moss, BEE, Dantin, and GIS with failing to obtain written authorization before performing hot work in the LACT area. Finally, Count 12 charges Wood Group, Srubar, Moss, BEE, Dantin, and GIS with violations of the Clean Water Act.

The Defendants have filed several motions seeking the dismissal of all or part of the charges in the Second Superseding Indictment for failure to state an offense.[9]  This Court will address each Motion in turn.

## LEGAL STANDARD

Pursuant to Federal Rule of Criminal Procedure 12(b), a party may challenge an indictment for failing to state an offense.  "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."[10]  In this circuit, "[t]he propriety of granting a motion to dismiss an indictment . . . is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact . . . .  If a question of law is involved, then consideration of the motion is generally proper."[11]  A court must take the allegations of the indictment as true and determine whether an offense has been stated.[12]  A defendant may not challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence.[13]  A court may, however, apply undisputed facts to resolve a question of law with a trial of the general issue.[14]

---

[9] When originally filed, these motions moved to dismiss charges in the Superseding Indictment.  Subsequent to the filing of these motions, however, the Government filed a Second Superseding Indictment.  The Second Superseding Indictment did not make any changes that would affect the arguments made in these motions.  Therefore, this Court will treat each motion as if it had moved for the dismissal of charges in the Second Superseding Indictment.

[10] Fed. R. Crim. Pro. 12.

[11] *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005).

[12] *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011).

[13] *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975).

[14] *Flores*, 404 F.3d 320.

## LAW AND ANALYSIS

Several of the defendants have filed motions to dismiss the charges against them.  This Court will address the specificities of each motion, as well as those arguments that were repeated by multiple defendants. Because several of the contractors have set forth similar arguments, this Court will first address those arguments together.

### A. Application of OCSLA to the Contractors

Defendants Don Moss, the Wood Group, GIS, and Curtis Dantin (the "Contractor-Defendants") each argue that the statutes under which they have been charged in Counts 4 through 11 do not apply to them, as independent contractors, and thus, should be dismissed.[15]  The Indictment seeks to hold the Contractor-Defendants criminally liable through 43 U.S.C. § 1350 of OCSLA. Section 1350 creates criminal liability for any knowing and willful violation of OCSLA's enabling regulations (the "OCSLA regulations").  Counts 4 through 11 of the Indictment claim that the Contractor-Defendants are criminally liable under § 1350 for the violation of 30 C.F.R. §§ 250.113(c)(1)(i), (ii) and (c)(3).    The Contractor-Defendants argue that these regulations are inapplicable to independent contractors.

"[I]n any case concerning the interpretation of a statute the 'starting point' must be the language of the statute itself."[16]  It is well-settled that statutes creating criminal penalties are to be strictly construed.[17]  Indeed, "[t]he rule that penal laws are to be construed strictly, is, perhaps, not much

---

[15] *See* Docs. 129, 114, 138 and 146 (adopting 138).

[16] *Lewis v. United States*, 445 U.S. 55, 60 (1980).

[17] *United States v. Boston & M. R. R.*, 380 U.S. 157, 160 (1965).

less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department."[18] "'A strict construction permits the words to be read naturally,' in a 'reasonable, sensible, and fair construction,' taking a 'common-sense view of the statute was a whole.'"[19] "Of course, the doctrine of strict construction is not absolute. The intention of the law-maker must govern in the construction of penal, as well as other statutes."[20]

### i.     The OCSLA Regulations

This Court will first outline the regulations that the Contractor-Defendants are charged with violating in Counts 4 through 11.   Counts 4 through 9 each charge some variation of Defendants with a violation of the OCSLA regulation 30 C.F.R. § 250.113(c)(1)(ii) on each day from November 11 through November 16, the day of the explosion.[21]   30 C.F.R. § 250.113(1)(ii) states that:

> If you cannot weld in one of the designated safe-welding areas that you listed in your safe welding plan, you must meet the following requirements: (1) You may not begin welding until: . . . (ii) You and the designated person in charge inspect the work area and areas below it for potential fire and explosion hazards.

---

[18] *Id.*

[19] *Nautilus Ins. Co. v. Int'l House of Pancakes, Inc.*, 622 F. Supp. 2d 470, 480 (S.D. Tex. 2009) (quoting 73 AM.JUR.2D STATUTES § 182).

[20] *United States v. McClain*, 545 F.2d 988, 996 (5th Cir. 1977) (internal quotations and alterations omitted).

[21] The contractors Wood Group, Dantin, and GIS are charged in Counts 4 through 9. Don Moss is charged in Count 9.  In addition, Christopher Srubar is charged in Counts 4 through 9 but has not moved this Court for dismissal of those charges.

Count 10 charges Moss, Dantin, and GIS with violation of 30 C.F.R. §
250.113(c)(3), which states that:

> (c) If you cannot weld in one of the designated safe-welding areas
> that you listed in your safe welding plan, you must meet the
> following requirements: . . . (3) You may not weld piping,
> containers, tanks, or other vessels that have contained a
> flammable substance unless you have rendered the contents inert
> and the designated person in charge has determined it is safe to
> weld. This does not apply to approved hot taps.

Count 11 charges Moss, Dantin, and GIS with violations of 30 C.F.R. §
250.113(c)(1)(i), which states that:

> (c) If you cannot weld in one of the designated safe-welding areas
> that you listed in your safe welding plan, you must meet the
> following requirements: (1) You may not begin welding until: (i)
> The welding supervisor or designated person in charge advises in
> writing that it is safe to weld.

Although the Contractor-Defendants are charged in different and
varying counts of the Indictment, they make similar arguments seeking
dismissal of those counts.  They argue that they cannot be held criminally
liable for violating these regulations because the regulations do not apply to
independent contractors.  The Government relies on three separate statutes in
rebutting this argument: 30 C.F.R. § 250.105, 30 C.F.R. § 250.146, and § 1350
itself.  This Court will address each of the Government's arguments in turn.

   *ii.    30 C.F.R. § 250.105*

As evidenced above, each of the OCSLA regulations was drafted in the
second person and speak to "You."  The Contractor-Defendants allege that they
do not fit the statutory definition of "You."  In 30 C.F.R. § 250.105, "You" is
defined as "a lessee, the owner or holder of operating rights, a designated
operator or agent of the lessee(s), a pipeline right-of-way holder, or a State

8

lessee granted a right-of-use and easement." The Indictment clearly alleges that BEE, and not the Contractor-Defendants, was the owner, lessee, and holder of operating rights on the Platform at the time of the explosion. In response, the Government argues that the Contractor-Defendants are included in the term "You" as agents working on behalf of BEE as defined under "traditional agency principles".[22] In making this argument, the Government fails to reconcile the more specific agency rules set forth in the OCSLA regulations and has provided this Court with no case law in which a Court applied general agency principles in contravention of the more specific agency rules set forth in the OCSLA regulations.[23] Indeed, the OCSLA regulations make clear that any designation of an agent or operator must be formally submitted to the Bureau of Safety and Environmental Enforcement ("BSEE") or the Bureau of Ocean Energy Management ("BOEM") to receive written approval.[24] The Government concedes that none of the Contractor-Defendants were specifically designated as agents or operators as required by the OCSLA regulations. Moreover, this Court can conjure no reason why Congress would have provided specific provisions for formally designating an agent if any contractor could then be held liable as an agent through common law theories. Such an interpretation would render the OCSLA designated agent provisions

---

[22] Doc. 160, p.8, n.4.
[23] "A well established canon of statutory interpretation succinctly captures the problem: '[I]t is a commonplace of statutory construction that the specific governs the general.'" *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070–71, (2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, (1992)).
[24] *See* 30 C.F.R. §§ 250.105, 145.

superfluous.[25]    As a result, this Court rejects the argument that the Contractor-Defendants are included in the definition of "You."

       *iii.*     *30 C.F.R. § 250.146(c)*

In further response, the Government directs this Court to a different OCSLA regulation that it believes supports criminally liability against the Contractor-Defendants.    The Government argues that the Contractor-Defendants can be held liable through 30 C.F.R. § 250.146(c), which states that:

> Whenever the regulations in 30 CFR parts 250 through 282 and 30 CFR parts 550 through 582 require the lessee to meet a requirement or perform an action, the lessee, operator (if one has been designated), and *the person actually performing the activity to which the requirement applies are jointly and severally responsible for complying with the regulation.*

The Government contends that pursuant to this statute the Contractor-Defendants can be held liable as the persons "actually performing the activity" because they were acting as agents of Black Elk on the platform during the construction process leading up to the explosion.

The Contractor-Defendants argue that § 250.146 merely requires that the "person actually performing the activity" *comply* with the OCSLA regulations, and that the regulation does not intend to speak to who is liable. In interpreting a regulation, the Fifth Circuit has held that the court should

---

[25] This interpretation avoids the "superfluity of a specific provision that is swallowed by the general one, 'violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute.'" *RadLAX Gateway Hotel, LLC*, 132 S. Ct. at 2071 (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).

first look to its plain language.[26]   Section 250.146(c) plainly speaks to compliance and not liability.

The Contractor-Defendants convincingly support this point with the legislative history of § 250.146.  In the proposed rules promulgated in 1998, the predecessor of BSEE stated the following in reference to the section that would become § 250.146:

> We would include an owner of operating rights in the definition of lessee. We would emphasize in §250.15(d) [now § 250.146(c)] that, in addition to the lessee and operator, all persons who conduct lease activities on behalf of the lessee or operator must also comply with its contractors. *MMS [BSEE's predecessor] will hold the operator accountable for the contractors' performance.*[27]

This legislative history confirms that § 250.146(c) was intended to speak to compliance, rather than liability.  The fact that a contractor must comply with OCSLA regulations does not also mean that it may be held criminally liable for their violation.  The issue here is not whether a contactor can act with impunity on the rig but whether it can be held criminally liable for it.  Indeed, if Congress had intended to treat contractors as jointly and severally liable for violation of the regulations, there is no reason that it would not have been expressly included contractors in the definition of "You."  In fact, the 1998 proposed revisions originally defined "You" as "the Lessee, right-of-way holder, or person acting on behalf of a lessee or a right-of-way holder."[28]   After the comment period, however, the definition was revised to specifically include

---

[26] *Lara v. Cinemark USA, Inc.*, 207 F.3d 783, 787 (5th Cir. 2000).

[27] Postlease Operations Safety, 63 Fed. Reg. 7335-01 (Feb. 13, 1998) (to be codified at 30 C.F.R. pts. 218, 250, & 256) (emphasis added).

[28] *Id.*

only those persons currently listed, removing the broader inclusion of persons acting "on behalf" of the lessee or operator.

The Government's reading of § 250.146 asks this Court to infer that because contractors must comply with OCSLA regulations, as § 250.146 clearly states, then they must also be held criminally liable for their violation; however, such an inference goes beyond the plain language of the regulation. "[W]here, as here, a regulatory violation carries criminal penalties, the regulation must be strictly construed and cannot be enlarged by analogy or expanded beyond the plain meaning of the words used."[29]  This Court declines to infer criminal liability where none otherwise exists.  Accordingly, this Court is unconvinced by the Government's attempt to use § 250.146 to hold the Contractor-Defendants criminally liable.

     *iv.*    *43 U.S.C. § 1350(c)*

Finally, the Government relies on 43 U.S.C. § 1350(c) to assess criminal liability on the Contractor-Defendants.  Section 1350(c) of OCSLA states that:

> *Any person* who knowingly and willfully (1) violates . . . any regulation or order issued under the authority of this subchapter designed to protect health, safety, or the environment or conserve natural resources . . . shall, upon conviction, be punished by a fine of not more than $100,000, or by imprisonment for not more than ten years, or both.[30]

The Government argues that the term "any person" indicates Congress's intention not to exclude any class of persons from criminal liability.  It fails to acknowledge, however, that a regulation cannot be violated by one to which it

---

[29] *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 482 (5th Cir. 2015) (internal quotations omitted).

[30] 43 U.S.C. § 1350 (emphasis added).

12

does not apply.  It is axiomatic that a regulation must apply to a person before he or she can be held liable for violating it.  The regulations at issue here apply to "You," and, as previously discussed, the Contractor-Defendants are not included in the regulatory definition of "You."  Although they are tasked with complying with the regulations, they are not part of the specific and finite group to which the regulations were intended to apply.    Therefore, the Government's reliance on 43 U.S.C. § 1350 is likewise unconvincing.

This Court holds that the plain language of OCSLA and its regulations do not support a criminal charge against the Contractor-Defendants.   In addition, this Court finds that such a holding comports with the traditional understanding of the OCSLA regulations.  Oil and gas operations on the outer continental shelf ("OCS") typically begin with a lessee who contracts with the United States government for the right to develop resources on the OCS.[31]  The lessee "agrees to pay rent and royalties, and consents to Departmental jurisdiction and regulation by BOEM and BSEE."[32]  The lessee may then designate an operator, who is authorized by both the lessee and the BOEM or BSEE to operate on the OCS and who also consents to the jurisdiction of the OCSLA regulations.[33]  "In contrast, contractors are neither lessees nor operators, and have no relationship or privity with the government, either in its role as a landlord or as a regulator. Contractors have no lease or other agreement with DOI agencies, and need no formal approval from BOEM or

---

[31] *See* 43 U.S.C. §§ 1332, 1334(a), 1337.
[32] John Cossa, *Liability of Owners, Contractors, & Non-Operators*, 2016 ROCKY MTN. MIN. L. INST. 6-2.
[33] *See* 30 C.F.R. §§ 250.105, 550.143.

BSEE to perform work on an OCS lease."[34]  For that reason, it is logical that the drafters of OCSLA may have intended to treat contractors differently from those entities that contracted with the government for the right to develop resources on the OCS.  Even BOEM has made public comments to this effect, stating in a response to the comments on a proposed rule that it "does not regulate contractors; we regulate operators."[35]

And indeed, by all accounts contractors *were* treated differently than lessees or operators under OCSLA.  The idea of contractor liability under OCSLA has arisen only in the last several years and no court has ever found a contractor liable for its violation.[36]

> For over 60 years since the enactment of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-1356b, in 1953, each of the government agencies responsible for overseeing the development of offshore oil and gas exclusively held lessees and their "designated operators" accountable for all violations of applicable oil and gas operating regulations on the Outer Continental Shelf ("OCS"), regardless of whether the violation was attributable to the lessee, the operator, or one of their independent service contractors. During that time, the government never attempted to enforce for violations of OCS operating regulations directly against a contractor. Instead, the government simply held lessees and operators responsible for any transgressions committed by those they retained to perform work on an OCS lease. This traditional enforcement practice reflected the widely held understanding that the Department of the Interior's offshore oil and gas enforcement authority was limited, by statute and its

---

[34] John Cossa, *Liability of Owners, Contractors, & Non-Operators*, 2016 ROCKY MTN. MIN. L. INST. 6-2.

[35] Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Safety and Environmental Management Systems, 75 Fed. Reg. 63610-01 (Oct. 15, 2010) (to be codified at 30 C.F.R. pt. 250).

[36] John Cossa, *Liability of Owners, Contractors, & Non-Operators*, 2016 ROCKY MTN. MIN. L. INST. 6-3.

implementing regulations, to holders of OCS leases and their designated operators, and did not extend to their contractors, subcontractors, or non-operator service providers. . . . [U]nder OCSLA, contractors have traditionally been held accountable only to the lessee or operator for the satisfactory and compliant performance of their duties. As far as the Department was concerned, it was the lessees and operators who bore the responsibility of ensuring that their contractor's work was compliant with federal regulations. If there was any problem, the regulations would be enforced against the lessees or operators.

That all changed when, in the wake of the Macondo incident, BSEE informally initiated a new policy of enforcing its safety and environmental regulations directly against contractors. Beginning in 2011, BSEE started issuing Notices of Incidents of Noncompliance ("INCs") to contractors that had been involved in offshore incidents such as platform explosions and fires prior to receiving notice of this policy change and, in some cases, BSEE assessed civil penalties against those contractors.[37]

Many of the contractors receiving INCs challenged the BSEE's authority to issue them. The first appeal to be adjudicated before the Department of Interior's Interior Board of Land Appeals ("IBLA") resulted in the *Island Operating Co.* opinion, in which the IBLA affirmed the BSEE's authority over contractors under OCSLA.[38] That opinion is now on appeal before the Western District of Louisiana. Thus, no district court has ruled on the issue of whether OCSLA's regulations are applicable to contractors. The novelty of this prosecution is not lost on this Court, and it is hesitant to allow the Contractor-Defendants to be criminally prosecuted for OCSLA violations when it is not yet

---

[37] *Id.*
[38] *Id.*; *Island Operating Co., LLC*, 186 IBLA 199 (Sep. 25, 2015).

established that they can even be subjected to civil penalties for those alleged violations.

This Court agrees with the Contractor-Defendants that this Indictment is an attempt to impermissibly extend the application of the OCSLA regulations to contractors. The Government rests much of its argument on the logic of holding contractors criminally liable for OCSLA violations. While this Court does not disagree that such may be appropriate, it is simply not provided for as the OCSLA provisions are currently written. A change in course to hold contractors liable for OCSLA violations must be initiated legislatively.

For all of the foregoing reasons, this Court holds that the Second Superseding Indictment fails to state an offense against the Contractor-Defendants. Although this Court has found the regulations and statutes at issue to be unambiguous, it notes that any remaining ambiguity would be resolved pursuant to the rule of lenity in the favor of the Contractor-Defendants.[39] Accordingly, Counts 4 through 11 against Moss, Dantin, GIS, and the Wood Group are dismissed.

### B. Black Elk

### i.    *Imputation of Knowledge*

BEE filed a Motion to Dismiss Counts 1 through 11 of the Indictment, adopted in whole by GIS, in which both defendants are charged with

---

[39] "The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. The rule vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed." *United States v. Kaluza*, 780 F.3d 647, 669 (5th Cir. 2015) (internal quotations omitted). The rule of lenity is to be applied only as a last resort. *Id.*

involuntary manslaughter and violations of OCSLA.  Each of these crimes require a heightened mental state—a wanton or reckless disregard or a knowing and willful action, respectively.  In its Motion, BEE argues that the Indictment fails to state an offense against it because it does not allege that it knew of the actions of its agents, the other defendants.  In making this argument, BEE relies on the Fifth Circuit's opinion in *Standard Oil Co. of Texas v. USA*, 307 F.2d 120, 129 (5th Cir. 1962), which addressed the difficult question of when the intentional criminal violations of an agent should be imputed to a corporate defendant.  The Government and BEE dispute the implications of *Standard Oil* and its progeny.  BEE contends that *Standard Oil* stands for the proposition that "knowing, willful and intentional criminal acts of an agent may <u>not</u> be imputed on a corporate defendant absent the principal's knowledge of those actions."[40]  The Government, on the other hand, contends that *Standard Oil* "allows imputation of an employee's knowledge to the corporation if that employee intended, at least in part, to benefit the corporation."[41]

This Court agrees with the Government's interpretation of *Standard Oil*'s holding.  In *Standard Oil*, two employees of an oil company falsified documents to benefit a third party.[42]  Their employers, Standard Oil and Pasotex, were charged with violations of the Connally Hot Oil Act, a statute that requires a knowing violation.[43]  The Fifth Circuit identified the issue as follows: "May a corporate employer be held liable for a crime committed by

---

[40] Doc. 133-1, p.11.
[41] Doc. 156, p.15.
[42] *Standard Oil Co. of Tex. v. United States*, 307 F.2d 120, 122 (5th Cir. 1962).
[43] *Id.*

employees who, although ostensibly acting in the performance of their duties, were really cooperating with a third person in the accomplishment of a criminal purpose for the benefit of that third person, and whose acts not only did not benefit the employer, but in some instances, at least, result in a theft of its property?"[44]  It found that it is insufficient to hold a corporate defendant criminally liable merely because an employee committed a criminal act while acting within the scope and function of his employment.[45]  Instead, the court held that "benefit [to the corporate defendant] is evidential in determining the purpose and motive for which the agent does the act in question.  If it is done with a view of furthering the master's business, of doing something for the master, then the expectation or hope of a benefit, whether direct or indirect, makes the act that of the principal."[46]  In discussing the imputation of knowledge in the case before it, the court found that the employees did not intend to benefit the corporate defendants.[47]  Indeed, they intended to steal and cheat their employer to the benefit of a third person, who was secretly paying the employees to do so.[48]  In light of these facts, the Fifth Circuit held that the employees did not intend to benefit their employer through their criminal acts and thus their mental state should not be imputed to the corporate defendants.[49]  It stated that:

> [T]o subject these corporations to criminal accountability it was necessary on accepted principles of imputation for each to know that these acts of [the employees] were being done. Under a statute

---

[44] *Id.*
[45] *Id.* at 128.
[46] *Id.*
[47] *Id.* at 129.
[48] *Id.*
[49] *Id.*

requiring that there be 'a specific wrongful intent,' and the 'presence of culpable intent as a necessary element of the offense * * *,' the corporation does not acquire that knowledge or possess the requisite 'state of mind essential for responsibility,' through the activities of unfaithful servants whose conduct was undertaken to advance the interests of parties other than their corporate employer.[50]

Subsequent cases have described the rule of *Standard Oil* as: "that the knowledge or guilty intent of an agent not acting with a purpose to benefit his employer, will not be imputed to the employer, when the latter is sought to be held liable under a statute requiring knowledge or guilty intent."[51]  Another case stated that: "[t]he law in this circuit is well-established: an employer is not liable for an employee's criminal acts, committed outside her or his scope of employment, if those actions injure the employer."[52]  The Court finds that the rule established by the case law is clear: knowledge of an agent's criminal acts can be imputed to a corporation if his acts were done with an intent to benefit the corporation.

The Government argues that the requisite mental intent should be imputed to BEE because the actions of the other defendants were intended to benefit BEE.  Specifically, it argues that the decision to do hot work on the LACT was made in order to keep on BEE's construction schedule.  BEE makes

---

[50] *Id.*

[51] *United States v. Ridglea State Bank*, 357 F.2d 495, 500 (5th Cir. 1966).

[52] *Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F.2d 129, 138 (5th Cir. 1987) (stating that "[g]iven the undisputed criminal nature of [the employee's] conduct [in accepting kickbacks and bribes solely in his own interest], and the resulting economic harm it caused to [the employer] Carbide, Carbide is clearly beyond the reach of antitrust liability.").

Union City Barge Line, Inc. v. Union Carbide Corp., 823 F.2d 129, 138 (5th Cir. 1987)

much of the fact that the other defendants' actions ultimately harmed it—to the tune of approximately $10 million in explosion response costs. However, the Fifth Circuit in *Standard Oil* made clear that the focus is on the agent's *intent* to benefit. "The act is no less the principal's if from such intended conduct either no benefit accrues, a benefit is undiscernible, or, for that matter, the result turns out to be adverse."[53] The facts of this case are distinguishable from *Standard Oil* and other cases in which courts have declined to impute the mental state of an employee to his employer.[54] In those cases, the employee acted with the intent to injure his employer or benefit only himself or another.[55] Here, the other defendants acted "in furtherance of their master's business" and intended to benefit BEE by completing the construction projects in a timely manner. BEE has failed to point the Court to a factually similar case in which mental intent was not imputed to the corporate defendant. The Indictment expressly alleges that the other defendants acted as agents of BEE "within the scope of their agency and employment for the benefit, at least in part, of BEE."[56] These principles are equally applicable to GIS, who adopted BEE's motion as its own. GIS's employees were aboard the rig working to fulfill GIS's obligation to complete construction. The Indictment explicitly alleges

---

[53] *Standard Oil Co. of Tex.*, 307 F.2d at 128–29.

[54] *See First Fed. Sav. Bank of Hegewisch v. United States*, 52 Fed. Cl. 774, 792 (2002); *Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F.2d 129, 138 (5th Cir. 1987); *Ridglea State Bank*, 357 F.2d at 500.

[55] *First Fed. Sav. Bank of Hegewisch*, 52 Fed. Cl. at 792 ("The court does not believe that embezzlement, misappropriated funds through unauthorized loans, and extortion benefitted plaintiff in any way."); *Union City Barge Line, Inc.*, 823 F.2d at 138 (stating that employer was beyond antitrust liability for employee who accepted kickbacks); *Ridglea State Bank*, 357 F.2d at 500 (stating that no benefit was intended when employee approved loans based on fraudulent applications that he knew would be defaulted).

[56] Doc. 148, p.10.

that Dantin and GIS's other employees "acted within the scope of their agency and employment for the benefit, at least in part, of GIS."[57] Accordingly, the Government has sufficiently stated an offense against BEE and GIS, and their Motion to Dismiss is denied.

ii.    *Daily Inspection Requirement*

Next, BEE propounds an additional argument for the dismissal of Counts 4 through 8 against it.[58]  In Counts 4 through 8, the Government has charged BEE with the violation of 30 C.F.R. § 250.113 for failure to conduct a pre-work inspection on each day leading up to the explosion from November 11 through November 15.  BEE argues that the plain language of 30 C.F.R. § 250.113(c)(1)(ii) does not require daily inspections of welding areas.  It argues that the regulation clearly states that an inspection need only occur before welding "begins." Indeed, the regulation reads as follows:

> If you cannot weld in one of the designated safe-welding areas that you listed in your safe welding plan, you must meet the following requirements:
> (1) You may not begin welding until:
> . . .
> (ii) You and the designated person in charge inspect the work area and areas below it for potential fire and explosion hazards.[59]

BEE argues that § 250.113(c)(1)(ii) does not impose a daily duty to inspect an area where hot work is being performed.  Instead, it requires only that an inspection occur before welding "begins," indicating a one-time event.  BEE

---

[57] Doc. 148, p.10.

[58] This argument was made by the Wood Group in its Motion to Dismiss Counts 4 through 9 (Doc. 114) and expressly adopted as its own by BEE (Doc. 136).  Because Counts 4 through 9 have been dismissed as against the Wood Group, this Court will address this argument as it related to BEE only.

[59] 30 C.F.R. § 250.113(c)(1)(ii).

argues that there are several OCSLA regulations that explicitly impose "daily" requirements, suggesting that if the authors of § 250.113 had intended such a duty, they would have said so explicitly.

The Government concedes that the regulation does not impose a daily inspection requirement. Instead, the Government contends that the regulation imposes a "renewing" obligation to perform an inspection each time hot work is begun.

BEE's argument presents a clear legal question: what is the meaning of "begins" in § 250.311(c)(1)(ii)? Does the regulation require, as the Government insists, a "renewing" obligation to perform a pre-work inspection each time hot work is authorized? Or does a single inspection, such as the one alleged in the Indictment, suffice to satisfy the regulation? In analyzing a regulation, the Fifth Circuit requires that the court first look to its plain language.[60] BEE suggests that the fairest reading of the text is that an inspection is a one-time requirement. However, this Court believes that a closer reading of the text reveals that the requirement is one of a renewing nature. Specifically, this Court finds the clause "for potential fire and explosion hazards" revealing. The regulation's purpose in requiring an inspection is to check for these hazards. It seems clear that such hazards may arise as construction continues, the area changes, or new equipment is introduced into the area. As the Government argues, construction by its very nature changes an area. It would seem

---

[60] *Kaluza*, 780 F.3d at 658 (5th Cir. 2015). ("The starting point in discerning congressional intent is the existing statutory text. . . . When faced with questions of statutory construction, we must first determine whether the statutory text is plain and unambiguous and, [i]f it is, we must apply the statute according to its terms." (internal quotations omitted)); *United States v. Fafalios*, No. 15-30146, 2016 WL 1009126, at *3 (5th Cir. Mar. 14, 2016) ("This court interprets regulations in the same manner as statutes, looking first to the regulation's plain language.").

illogical, and ill-advised, to propound a regulation that requires an inspection to identify hazards only at the beginning of a welding project.  "A regulation should be interpreted in a manner that effectuates its central purposes."[61]  A contrary reading would be unreasonable, and BEE has pointed this Court to no legislative history or case law that would suggest a different finding.[62] Accordingly, this Court holds that BEE's Motion to Dismiss Counts 4 through 8 is denied.

### C. Clean Water Act

Finally, the Court will address the Wood Group's Motion to Dismiss Count 12, which charges it with a violation of the Clean Water Act ("CWA"). Wood Group argues that the Government has failed to state an offense against it in Count 12 because the Indictment does not allege a causal link between the Wood Group's actions and the explosion and resulting oil discharge.  Count 12 charges several of the defendants under 33 U.S.C. § 1321(b)(3), which prohibits the "discharge of oil or hazardous substances [] into or upon the navigable waters of the United States . . . which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States . . . in such quantities as may be harmful as determined by the President."  Wood Group argues that the Indictment fails to allege facts

---

[61] *Anthony v. United States*, 520 F.3d 374, 380 (5th Cir. 2008); *see Rathbun v. United States*, 355 U.S. 107, 109 (1957) ("Every statute must be interpreted in the light of reason and common understanding to reach the results intended by the legislature.")

[62] "For the language to be considered ambiguous . . . it must be susceptible to more than one reasonable interpretation or more than one accepted meaning." *Kaluza*, 780 F.3d at 658–59.

that would support a finding that it was both a proximate and but-for cause of the discharge that resulted from the explosion.

This Court disagrees.  An indictment "need not set forth every evidentiary detail necessary to establish the elements of the offense."[63]  The Indictment alleges numerous failures on the part of the Wood Group and its employees that could be found to be a cause of the explosion.  The Wood Group's motion asks this Court to make factual findings that would be inappropriate at this stage, and many of its arguments amount merely to defenses.[64]  It is in the province of the jury to determine whether the acts of the Wood Group and its employees in failing to perform a pre-work inspection prior to issuing a hot work permit, failing to discuss the construction plans with other defendants, failing to designate a fire watch or take readings with a gas detector, or failing to conduct a morning safety meeting were a cause of the explosion and resulting oil discharge.  The question of causation is typically a question of fact, which should be left to the factfinder.[65]  This Court holds that the Indictment has alleged sufficient facts that could support a causation finding by the jury.

In addition, the Wood Group argues that the Indictment fails to state an offense against it because the facts therein do not allege criminal negligence. The Wood Group relies on general Supreme Court precedent discussing mens rea to argue that the CWA requires criminal negligence. The Government correctly rebuts that it is controlling Fifth Circuit law that the Clean Water

---

[63] *United States v. Cauble*, 706 F.2d 1322, 1334 (5th Cir. 1983).

[64] "The propriety of granting a motion to dismiss an indictment under F.R.Crim.Pro. Rule 12 by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact."  *United States v. Miller*, 491 F.2d 638, 647 (5th Cir. 1974). "If a question of law is involved, then consideration of the motion is generally proper."  *Flores*, 404 F.3d at 324 (internal quotations omitted).

[65] *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 259 (5th Cir. 2006).

Act requires only ordinary negligence.  Indeed, in *United States v. Pruett*, 681 F.3d 232 (5th Cir. 2012), the Fifth Circuit explicitly stated that 33 U.S.C. § 1319(c)(1)(A) "requires only proof of ordinary negligence." Accordingly, Wood Group's argument fails on this point as well.  The Wood Group's Motion to Dismiss Count 12 is denied.

## **CONCLUSION**

For the foregoing reasons, Defendants Black Elk Energy Offshore Operations LLC and Grand Isle Shipyard's Motion to Dismiss Counts 1 through 11 is DENIED (Docs. 133, 142); Defendant Don Moss's Motion to Dismiss Counts 9, 10, 11 is GRANTED (Doc. 129); Defendants Grand Isle Shipyard and Curtis Dantin's Motion to Dismiss Counts 4 through 11 is GRANTED (Doc. 138, 146); Defendant Wood Group PSN, Inc.'s Motion to Dismiss Counts 4 through 9 is GRANTED (Doc. 114); Defendant Black Elk's Motion to Dismiss Counts 4 through 8, as partially adopted from the Wood Group's Doc. 114, is DENIED (Doc. 136); and Defendant Wood Group PSN, Inc.'s Motion to Dismiss Count 12 is DENIED (Doc. 121).  The charges in Counts 4 through 11 of the Second Superseding Indictment against Don Moss, Curtis Dantin, the Wood Group PSN, Inc. and Grand Isle Shipyards are DISMISSED.

New Orleans, Louisiana this 14th day of April, 2015.

JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE