UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 15-197** |
| v. | * | **SECTION: "H"** |
| **DON MOSS** | * | |
| * | * | * |

## FACTUAL BASIS

The United States, represented by the United States Attorney's Office for the Eastern District of Louisiana and the Environmental Crimes Section of the Department of Justice, and the defendant, DON MOSS, ("MOSS") hereby agree that this Factual Basis is a true and accurate statement of the Defendant's criminal conduct, that it provides a sufficient basis for the Defendant's plea of guilty to Count Four in the Third Superseding Indictment in the above-captioned matter, and had this matter proceeded to trial, the following facts would be established beyond a reasonable doubt through competent evidence and testimony:

From July 1, 2010, until October 13, 2013, Black Elk Energy Offshore Operations LLC ("BEE"), a privately held limited liability company, owned and operated an oil production facility erected on a federal mineral lease, OCS-00367, in the Gulf of Mexico, approximately eight nautical miles from the shoreline of Louisiana, at an area designated as West Delta 32, in the territorial jurisdiction of the Eastern District of Louisiana. BEE's production facility at West Delta 32 consisted of three bridged platforms, "A," "D," and "E." The facility was operated by a crew employed by WOOD GROUP PSN, INC. ("WOOD GROUP PSN") consisting of a lead operator, also known as a Person-In-Charge ("PIC"), two "A" operators, a "C" operator, and a Roustabout. The PIC was responsible for the oversight and safety of the production facility.

On or about September 1, 2012, oil production at West Delta 32 was shut-in, meaning that the oil was not flowing through the wells at the facility, due to damage in the pipelines that transported BEE's oil. From on or about September 1, 2012, until on or about November 16, 2012, the facility at West Delta 32 underwent repairs. BEE initiated construction projects that included replacing the floatcell (also known as the WEMCO), upgrades to the free water knockout separator area, replacing valves on the manifold of the production header, and installing a divert valve on the Lease Automatic Custody Transfer ("LACT") unit and tying it into the sump line piping.

The LACT system was the last point in the production process prior to the oil leaving West Delta 32 and entering the sales transmission pipeline. The LACT system consisted of two pumps that took suction from one of two 400 barrel Dry Oil Tanks on the "E" platform. The pumps discharged through the basic sediment and water ("BS&W") monitor and then through the oil pipeline pumps to the sales pipeline. BEE planned to have the system modified to include a divert valve. The divert valve would redirect flow to the Wet Oil Tank when the BS&W monitor indicated unacceptable contaminants in the crude oil, keeping it out of the pipeline for sale until it was processed to an acceptable quality.

In October 2012, BEE contracted with an engineering firm to design plans for the floatcell replacement. BEE hired defendant MOSS to be physically present at the West Delta 32 facility to inspect and coordinate the construction projects. Like all the workers on the platform, MOSS was also responsible for making sure that all work was done in a safe manner. MOSS also accounted for expenditures for the projects and coordinated the arrival and departure of work boats that ferried supplies to the platform.

The construction projects MOSS was to coordinate and inspect were to be physically completed by crews from defendant GRAND ISLE SHIPYARD, INC. ("GIS"). Beginning at a time unknown, but prior to November 3, 2012, BEE contracted with GIS and requested a multiple man construction crew. GIS and BEE had forged a Business Alliance Agreement prior to this time wherein GIS was a preferred contractor for BEE. GIS employed defendant CURTIS DANTIN ("DANTIN"), a construction superintendent, to be physically present on West Delta 32 managing the construction project and workers. GIS staffed the job with its own employees and employees from a third-party subcontractor. The employees of GIS's subcontractor were all from the Philippines. WOOD GROUP PSN's operators supported the construction efforts to include conducting crane operations and issuing necessary hot work permits.

The construction projects on West Delta 32 required hot work to be done. Hot work is welding, grinding, and/or any other activity that may produce a spark. Hot work on an oil production facility is a hazardous activity capable of causing injury or death if done without due care and adherence to safety procedures and regulations.

In November of 2012, BEE's company policies mirrored Title 30 of the Code of the Federal Regulations Section 250.113(c)(1)(i) and required that written permission, commonly referred to as a "hot work permit," be issued by the welding supervisor or designated PIC before any hot work on a production platform began. Those involved in welding and the PIC were required to (1) conduct a pre-work inspection of the areas where welding or associated hot work was to be performed, (2) ensure that the area below and around the area where the work was to be performed was free from fire and explosion hazards with any equipment containing hydrocarbons or other flammable substances moved from within 35 feet of welding

3

areas, and (3) ensure that a firewatch with gas detection equipment had been assigned. If equipment containing flammable substances could not be moved, it had to be flame proofed or the contents rendered inert.

A hot work permit was not valid indefinitely. At a maximum, a hot work permit was valid for 12 hours. Once a hot work permit expired, all the precautionary steps, including a pre-work inspection, should have been completed again before a new hot work permit was issued. Welding on piping that had contained hydrocarbons was prohibited unless the piping was first rendered inert and the PIC determined that it was safe to weld.

Months before the explosion, BEE had attempted to perform the LACT upgrade, but had to postpone the work. At that time, BEE decided to eliminate field welding needed for the project by sending the piping to GIS to have all the welding done onshore and to build additional spool pieces so that the piping needed to connect the LACT divert valve to the sump line piping could be bolted in place.

MOSS knew that BEE hoped to be able to resume production on the platform soon after November 16, 2012. BEE would save money if the LACT upgrade could be completely finished before production resumed, and the upgrade would not have to performed at a later date when oil was flowing from the wells. On or about November 11, 2012, MOSS informed BEE on-shore representatives, CHRIS SRUBAR ("SRUBAR"), and DANTIN that the piping and divert valve necessary for the LACT upgrade were lost. MOSS informed BEE on-shore representatives he would not be able to finish the project on schedule unless the piping was rebuilt immediately. Although the divert valve was found on the platform, when it was confirmed that all the prefabricated piping for the upgrade was lost, BEE decided to save time by having all the piping re-built except for the additional spool pieces. Without the additional

4

spool pieces, the construction crews were required to complete field welds on the LACT piping in order to connect the divert valve to the sump line piping. The BEE shoreside employee who made the decision to weld the sump line piping, instead of bolting the piping into place, did not effectively communicate the plan to weld the sump line piping to SRUBAR or to the BEE operations' supervisors who communicated with SRUBAR on a daily basis.

Even with the facility shut-in, this newly-added hot work required the sump line piping to be isolated from the Wet Oil Tank and any contents of the piping to be rendered inert before welding occurred. MOSS and DANTIN knew that the welding of the sump line piping would be required to complete the LACT unit upgrade. Prior to the construction crew performing any hot work on the piping, authorization and verification was required to ensure that the piping was safe. This would require a pre-work inspection with SRUBAR and the welders, the designation of a firewatch with a gas detector, and a hot work permit specifically authorizing hot work for the LACT unit or sump line piping.

MOSS and DANTIN never coordinated or communicated with SRUBAR about making the lines for the LACT unit upgrade safe for hot work. On the evening of November 15, 2012, MOSS and DANTIN knew that GIS crews were bolting in the divert valve for the LACT unit upgrade, which did not require hot work, but MOSS and DANTIN knew that the crews were going to work in the area again the next day and welding would be required to connect the divert valve piping to the sump line piping. However, on November 16, 2012, neither MOSS nor DANTIN asked SRUBAR to make the sump line safe, nor told GIS crews in their morning safety meeting not to weld on the sump line piping until SRUBAR or crews from WOOD GROUP PSN deemed it safe.

After DANTIN led a 6:00 a.m. safety meeting with the GIS workers on November 16, 2012, he instructed some of GIS's subcontracted construction workers to begin the welding of the sump line piping for the LACT unit upgrade, while others finished projects elsewhere. MOSS only briefly attended the safety meeting that morning, and SRUBAR did not attend at all. MOSS's comment to the crews that morning was to get their work done because he wanted to go home and drink beer. Despite SRUBAR having received the Daily Construction Report by email before 7:00 a.m. on November 16, 2012, which indicated that work had been performed on the LACT unit the night before, SRUBAR did not inquire about the job or walk the platform to make sure he knew what was happening. The "C" operator was present in the galley, eating breakfast, at the same time GIS was there conducting its 6:00 a.m. safety meeting, but he did not understand that hot work was intended for areas outside of the WEMCO, separator, and production header and did not ask GIS where they would be working on November 16, 2012. The single hot work permit the "C" operator issued that day did not list the LACT unit or sump line piping as areas that were safe for hot work; instead, the hot work permit merely copied the same three areas listed on the prior days' permits, even though the LACT unit upgrade would require welding in a new location. The GIS crew wrote a Job Safety Analysis worksheet (also known as a WP/SEA), which all the crew signed, but MOSS did not read it before the GIS crew began their work.

DANTIN was watching as the workers made cuts to the sump line piping leading to the Wet Oil Tank. The Wet Oil Tank was approximately 20 feet from the welding area on the sump line piping. The Wet Oil Tank could not be physically moved 35 feet from the welding area, and the hydrocarbons in the Wet Oil Tank had not been rendered inert prior to the workers beginning the project. After the workers made the cuts to the sump line piping, liquid

spilled from the piping. DANTIN and the workers decided that the liquid was water, without asking MOSS, SRUBAR, or the WOOD GROUP PSN crew that was familiar with the platform piping whether the piping was safe. DANTIN then left the area and returned to the office, on an adjacent platform, where MOSS and SRUBAR had offices.

After the cuts to the sump line piping, the construction workers began grinding on the piping, in preparation for welding. At approximately 9:00 a.m., the workers started to tack weld on the cut piping with an arc welder. The welding ignited the hydrocarbon vapors that had escaped from the Wet Oil Tank. The ignition of these vapors, which came straight from the sump piping that was connected to the Wet Oil Tank, caused a series of explosions in the three oil tanks on the platform. The Wet Oil Tank and one of the two Dry Oil Tanks were blown into the Gulf of Mexico. The other Dry Oil Tank was blown off its base and destroyed the platform crane that was positioned above it. Oil spilled into the Gulf of Mexico, causing a sheen on the water. Oil rained down on the lower deck of the platform, where workers below the LACT unit had been performing other construction activity.

The explosions happened because, prior to the crews going to work on the morning of November 16, 2012, MOSS, SRUBAR, and DANTIN failed in their obligation regarding the work to be done for LACT unit upgrade. Specifically, they failed to properly communicate regarding crucial details, including the planned welding at the site of the explosion, despite the fact that each of them lived and worked on West Delta 32 from November 8, 2012, until November 16, 2012, and that each of them knew days before November 16, 2012, that the LACT unit upgrade was part of the construction work to be done on the platform.

MOSS admits that he was negligent in the manner in which he executed and performed his duties on the West Delta 32 platform. MOSS acknowledges that he failed to

7

effectively communicate to DANTIN and the construction crew at their morning safety meeting and the Job Safety Analysis meeting that the sump line piping had not been rendered safe for hot work. As result of his negligence, oil entered the Gulf of Mexico in a quantity sufficient to cause a sheen.

READ AND APPROVED:

_____      3/28/18
Don Moss                                                        Date
Defendant

_____      3/28/18
Walter Becker                                         Date
Attorney for Defendant

_____      3/19/18
Emily K. Greenfield La. Bar. 28587    Date
Assistant United States Attorney

_____      3/28/18
Kenneth E. Nelson                                Date
Senior Trial Attorney, ECS